AUSAs: Brandon Christopher Thompson; Maggie Lynaugh

**23 MAG 6444**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREI MENDEZ and<br>CARLISTO ACEVEDO BRITO,<br><br>Defendants. | <u>**SEALED COMPLAINT**</u><br><br>Violations of 21 U.S.C. §§ 812, 841, 846;<br>18 U.S.C. § 2<br><br>COUNTY OF OFFENSE:<br>BRONX |

SOUTHERN DISTRICT OF NEW YORK, ss.:

   KYLE HARRELL, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

**COUNT ONE**
**(Conspiracy to Distribute Narcotics)**

   1.   From at least in or about July 2023 through at least in or about September 2023, in the Southern District of New York and elsewhere, GREI MENDEZ and CARLISTO ACEVEDO BRITO, the defendants, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

   2.   It was a part and an object of the conspiracy that GREI MENDEZ and CARLISTO ACEVEDO BRITO, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

   3.   The controlled substance involved in the offense was 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

**COUNT TWO**
**(Possession with Intent to Distribute Narcotics)**

   4.   On or about September 15, 2023, in the Southern District of New York and elsewhere, GREI MENDEZ and CARLISTO ACEVEDO BRITO, the defendants, knowingly and intentionally distributed and possessed with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and aided and abetted the same.

5.      The controlled substance involved in the offense was 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(A); Title 18, United States Code, Section 2.)

The bases for my knowledge of the foregoing charge are, in part, as follows:

6.      I am a Special Agent with the Drug Enforcement Administration (the "DEA") and have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

7.      From at least in or about July 2023 through at least in or about September 2023, the defendants and others conspired to distribute fentanyl, including at a children's daycare center in the Bronx, New York (the "Daycare"). There, despite the daily presence of children, including infants, the defendants maintained large quantities of fentanyl, including a kilogram of fentanyl stored on top of children's playmats. In addition, the defendants maintained in the Daycare items purpose-built for the distribution of large quantities of narcotics, including so-called "kilo presses," which are designed for the re-compression of drugs in powder form commonly used by narcotics traffickers at "mills" or other locations where narcotic drugs are broken down, combined with fillers or other narcotics, and portioned for sale. As a consequence of the defendants' drug conspiracy, on or about September 15, 2023, at the Daycare, four children, who were all under three years of age, appeared to have experienced the effects of poisoning from exposure to fentanyl. Three of the children were hospitalized with serious injuries. The fourth child, a one-year-old boy, has died.

## Four Children Poisoned by Fentanyl at a Daycare Facility

8.      Based on my participation in this investigation, my review of law enforcement reports and records, and communications I have had with other law enforcement officers, I know the following:

a. At approximately 2:40 p.m., on September 15, 2023, GREI MENDEZ, the defendant, who is the operator of the Daycare, called 911 to report that all three children in her care were unresponsive.

b. Shortly thereafter, an ambulance arrived at the Daycare and took the three children, whose ages ranged approximately between eight months to two years, to a nearby hospital. There, one of the children ("Minor Victim-1"), a one-year-old boy, was pronounced dead.

    c. Medical professionals administered NARCAN[1] to the other two children ("Minor Victim-2" and "Minor Victim-3"). Minor Victim-2 and Minor Victim-3 required hospitalization for their injuries. An analysis of urine from one of the Minor Victims confirmed the presence of fentanyl in the child's body.

    d. A fourth child ("Minor Victim-4," and, together with Minor Victims-1 through -3, the "Minor Victims"), who is approximately one year old, also attended the Daycare on or about September 15, 2023, and was picked up by a parent approximately two hours before MENDEZ's 911 call. Upon noticing that the child was lethargic and not responsive, Minor Vicim-4's parent took Minor Victim-4 to a nearby hospital, where medical professionals administered NARCAN. Minor Victim-4's injuries required hospitalization.

    e. With respect to each of the Minor Victims, medical professionals noted their symptoms and injuries appeared to be consistent with opioid poisoning. Additionally, with respect to Minor Victims-2, -3, and -4, medical professionals noted the children appeared to respond positively to the effects of the administration of NARCAN, consistent with their having experienced opioid poisoning.

    f. MENDEZ informed law enforcement officers who responded to the Daycare, in substance and in part, that CARLISTO ACEVEDO BRITO, the defendant, lived inside the bedroom located in the Daycare (the "Bedroom"). Emergency personnel who first responded to the scene observed that the Bedroom was locked upon their arrival. MENDEZ called ACEVEDO BRITO and requested that he return to location, and ACEVEDO BRITO arrived at the Daycare shortly thereafter.

### Search of the Daycare

  9. Based on communications I have had with law other law enforcement officers, and my review of law enforcement reports and records, I have learned that:

    a. Shortly after the Minor Victims were removed from the Daycare and treated by medical personnel, law enforcement officers searched the Daycare pursuant to a warrant. The Daycare operated out of a one-bedroom apartment consisting of the Bedroom, a playroom, a bathroom, and a kitchen. During the Daycare search, law enforcement officers found both large quantities of fentanyl as well as machinery and paraphernalia used to package narcotics.

    b. In particular, in a hallway closet located near the Daycare bathroom, law enforcement officers found a packaged white, powdery substance weighing approximately one kilogram that field-tested positive for fentanyl. The fentanyl was located inside of a bag that was stacked on top of pieces of a children's playmat. Law enforcement officers also found two "kilo press" machines and accompanying machine parts, including at least one hydraulic press. Based on my training and experience, I know that kilo presses are used by narcotics traffickers to exert pressure and compress illegal narcotics into kilogram-sized "bricks" in preparation for distributing wholesale quantities of narcotics. Law enforcement officers found one additional kilo press in the Bedroom closet. Law enforcement officers further recovered packaging materials, such as vacuum

---

[1] NARCAN, or naloxone, is an over-the-counter nasal spray that has been approved by the Food and Drug Administration to reverse opioid overdose.

bags and a vacuum sealer, including vacuum bags that appear to be consistent with a vacuum bag containing the above-described kilogram of fentanyl. The narcotics recovered and one of the recovered kilo presses are pictured below.

 

### MENDEZ's Attempt to Remove Evidence from the Daycare Prior to the Search

10. Based on my conversations with other law enforcement officers, my review of reports, my review of security footage from the exterior of the Daycare and the interior hallway outside of the Daycare, my review of a cellphone that GREI MENDEZ, the defendant, gave law enforcement officers consent to search, and my participation in this investigation, I have learned the following about MENDEZ's actions prior to the arrival of emergency medical professionals.

    a. According to MENDEZ's call records and law enforcement reports:

        i. MENDEZ called 911 regarding the unresponsive children at approximately 2:40 p.m. on or about September 15, 2023.

        ii. Immediately *before* calling 911, MENDEZ placed three phone calls. The first was to another employee of the Daycare at approximately 2:39 p.m. The second two were to an individual who MENDEZ later identified as her husband ("CC-1"). MENDEZ's first call to CC-1 was unanswered; her second call to CC-1 lasted just over ten seconds.

        iii. After speaking to 911 for approximately six minutes, beginning at approximately 2:52 p.m., MENDEZ placed several additional calls to CC-1. The last call took place at approximately 2:53 p.m. and lasted approximately one minute and 16 seconds.

    b. Several minutes before emergency personal arrived at the scene, surveillance footage showed CC-1 enter the Daycare empty-handed and then exit approximately two minutes later carrying what appears to be two shopping bags weighted with contents. Instead of exiting through the front door, CC-1 exited the building in which the Daycare was located out a back alley.

  c. Based on my training and experience as a law enforcement officer, I know that the timing of CC-1's entrance and then swift exit out a back alleyway from the Daycare, where the Minor Victims were unresponsive and waiting for emergency assistance to arrive, and while carrying shopping bags, is consistent with the behavior of an individual attempting to remove materials from the Daycare to avoid their discovery by law enforcement.

## The Investigation

11. In addition to the above-described evidence, based on my participation in the investigation I have learned, among other things, the following:

### Cellphones

12. As described above, GREI MENDEZ, the defendant, gave law enforcement officers consent to search certain electronic devices in her possession, including her cellphone. Based on my review of the content of those devices, I have learned the following:[2]

  a. MENDEZ deleted approximately 21,526 messages from an encrypted messaging application on which she had exchanged messages with CC-1 between approximately on or about March 30, 2021 and September 15, 2023.

  b. Based on my review of deleted encrypted messages that were able to be recovered during a forensic extraction of MENDEZ's cellphone, I know that MENDEZ sent CC-1 various messages while MENDEZ was with members of law enforcement later in the day on September 15, 2023, following the incident at the Daycare. In these messages, MENDEZ informed CC-1 that law enforcement was asking questions about him, including questions regarding his whereabouts. CC-1 instructed MENDEZ to tell law enforcement, among other things, that he was working. In addition, MENDEZ informed CC-1 that she told law enforcement that CC-1 was "down there" and told him to go out and look for a lawyer.[3]

  c. Based on my training, experience, and involvement in this investigation, I believe that MENDEZ deleted messages with CC-1 after law enforcement responded to the Daycare.

13. After arriving at the Daycare, CARLISTO ACEVEDO BRITO, the defendant, also gave law enforcement officers consent to search certain electronic devices in his possession. Based on my review of the content of those devices, I have learned that ACEVEDO BRITO has exchanged numerous messages with others that, in my training and experience, indicate his participation in narcotics trafficking. For example, I have reviewed the following messages:

---

[2] The messages contained on both MENDEZ's and ACEVEDO BRITO's electronic devices were almost entirely in Spanish. I have been assisted in reviewing the messages by members of law enforcement fluent in the Spanish language.

[3] Based on my participation in this investigation, I know that CC-1 and MENDEZ resided together in an apartment located in an apartment building adjoining the building that housed the Daycare. Accordingly, I understand MENDEZ's use of "down there" to refer to the Daycare.

   a. On or about August 22, 2023, ACEVEDO BRITO received messages using the same encrypted messaging application used by GREI MENDEZ, the defendant, from an individual ("CC-2") stating, in sum and substance, that ACEVEDO BRITO should tell "the old guy"[4] that if he is going to take the garbage out, the police are out there on the side. ACEVEDO BRITO responded, in sum and substance, that he understood.

   b. On or about August 23, 2023, CC-2 sent ACEVEDO BRITO an encrypted messaging application message asking, in sum and substance, whether he was sleeping, because CC-2 wanted ACEVEDO BRITO to look outside and tell CC-2 if he saw the cops. In response, ACEVEDO BRITO called CC-2.

   c. On or about September 12, 2023, ACEVEDO BRITO received an encrypted messaging application message from CC-2 stating, in sum and substance, that CC-2 had left ACEVEDO BRITO "una torta"[5] on the table in a white bag. Approximately one hour later, CC-2 sent ACEVEDO BRITO another encrypted messaging application message that CC-2 then deleted.

### Surveillance Footage

 14. Based on my review of surveillance footage of the Daycare, I have learned that in addition to entering the daycare and carrying out bags a few minutes before the arrival of emergency personnel, CC-1 was present inside the Daycare earlier that same day, including immediately prior to the time that Minor Victim-4 was picked up by a parent. In particular, surveillance footage shows that, at approximately around noon, CC-1 entered the Daycare empty-handed, and then left the Daycare approximately five minutes later holding what appears to be a bowl.

### Statements by the Defendants to Law Enforcement

 15. Based on conversations I have had with other law enforcement officers, I have learned that both GREI MENDEZ and CARLSITO ACEVEDO BRITO, the defendants, waived their *Miranda* rights and agreed to speak with law enforcement officers. Based on those conversations, I have learned that the defendants stated, among other things, the following, in substance and in part:

   a. During the course of MENDEZ's interview, MENDEZ (i) denied that there were drugs in the Daycare; (ii) claimed she cleaned the Daycare approximately 6 days each week from top to bottom; (iii) suggested that the kilo presses could have been left inside the Daycare by a prior occupant; (iv) falsely stated that no one, such as CC-1, had come into the Daycare on September 15, 2023; and (v) identified ACEVEDO BRITO as the tenant of the locked room within the Daycare and as the cousin of her husband, CC-1.

---

[4] In ACEVEDO BRITO's phone, CC-1's phone number is saved under the name "Viejo." Based on conversations with law enforcement agents fluent in the Spanish language, I understand that that "Viejo" translates to "old guy" in Spanish. Accordingly, I believe the reference to "Viejo" or "old guy" in ACEVEDO BRITO's messages is likely a reference to CC-1.

[5] Based on my training and experience and my conversations with other law enforcement officers, I know that "torta" means "sandwich" or "cake" in Spanish. Furthermore, based on my training and experience, I know that "cake" is often used to refer to a kilogram of narcotics.

b. During the course of ACEVEDO BRITO's interview, ACEVEDO BRITO: (i) admitted that for approximately the previous two weeks he rented the Bedroom for $200 per week; (ii) denied knowing anything about drugs in the Daycare; (iii) denied knowing anything about the kilo press in the closet of the Bedroom; and (iv) claimed he was the sole occupant and maintained sole access to the otherwise locked Bedroom, but that at night he used other rooms in the Daycare, including, for example, the playroom, where he would watch television.

WHEREFORE, I respectfully request that warrants be issued for the arrest of GREI MENDEZ and CARLISTO ACEVEDO BRITO, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

/s Kyle Harrell  (By Court with Authorization)
KYLE HARRELL
Special Agent
Drug Enforcement Administration

Sworn to me through the transmission of
this Complaint by reliable electronic
means, this 17th day of September, 2023.

_____
THE HONORABLE SARAH L. CAVE
United States Magistrate Judge
Southern District of New York